## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| IMBERATEK LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>LENOVO GROUP LIMITED, LENOVO (BEIJING) LIMITED, LENOVO (THAILAND) LIMITED, MOTOROLA MOBILE COMMUNICATION TECHNOLOGY LTD., and MOTOROLA (WUHAN) MOBILITY TECHNOLOGIES COMMUNICATION COMPANY LIMITED,<br><br>    Defendants. | Civil Action No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff ImberaTek LLC ("ImberaTek") brings this action against Defendants, Lenovo Group Limited, Lenovo (Beijing) Limited, Lenovo (Thailand) Limited, Motorola Mobile Communication Technology Ltd., and Motorola (Wuhan) Mobility Technologies Communication Company Limited (collectively, the "Defendants"; collectively, Defendants other than Lenovo Group Limited are "Codefendants") and alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action for patent infringement (hereinafter the "Action"), brought under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, seeking damages and other relief arising out of Defendants' infringement of United States Patent Nos. 8,487,194 (the "194 Patent"), 8,817,485 (the "485 Patent"), 9,107,324 (the "324 Patent"), and 9,883,587 (the "587 Patent") (collectively, the "Asserted Patents").

2.     ImberaTek owns the entire right, title, and interest in and to each of the Asserted Patents.

3.     Defendants have infringed each Asserted Patent by, without ImberaTek's authorization, making, using, offering to sell, and selling in, and/or importing into the United States products including certain semiconductor technology. Further, Defendants have indirectly infringed each Asserted Patent by, without ImberaTek's authorization, making, selling, and supporting products including certain semiconductor technology knowing that the same will be imported into, sold, and used in the United States and cause direct infringement.

## THE PARTIES

4.     Plaintiff ImberaTek is a Texas corporation with an address at 14205 North Mopac Expressway, 5th Floor, Austin, TX, 78728.

5.     Defendant Lenovo Group Limited ("LGL") is a corporation organized and existing under the laws of the People's Republic of China, with an address at 23rd Floor, Lincoln House, Taikoo Place, 979 King's Road, Quarry Bay, Hong Kong S.A.R., China. LGL may be served with process pursuant to the provisions of the Hague Convention. LGL may also be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute. This action arises out of the business in which LGL engages in Texas.

6.     LGL is the parent company of a multinational conglomerate and is a global leader in the mobile phone market. Lenovo, primarily through its Motorola subsidiaries and brand, was the third largest supplier of smartphones in the United States in recent years – accounting for more

than ten percent of U.S. shipments of such products.[1] LGL and its subsidiaries – to which the company refers collectively as "Lenovo or 'Lenovo Group' or the 'Group'"[2] – have a global reach and a strong presence in the United States. "Lenovo is listed on the Stock Exchange of Hong Kong under Lenovo Group Limited" (*i.e.*, the first-named Defendant above) (*see* n.2 *supra*), is "ranked at 217 in the Fortune Global 500, … [and] employs 77,000 people worldwide"[3] – including more than 5,000 in the United States[4] –, and serves millions of customers in 180 markets (*see* n.2 *supra*). On information and belief, many of Lenovo's U.S. employees are involved with management, legal, design, engineering, marketing, and supply chain functions. In 2025 (for the year ended March 31), Lenovo's revenue was US$69 billion,[5] of which US$23.3  billion was derived from the Americas.[6] On information and belief, a substantial portion of Lenovo's revenue from its operations in the Americas is generated in the United States.

7.     LGL, acting directly through, and in concert with, subsidiaries, affiliates, or intermediaries, including but not limited to LGL's Codefendants named herein (and, upon information and belief, other subsidiaries whose roles in the infringing conduct will be revealed after an opportunity for discovery), all of which are LGL's agents or alter egos, manufactures, imports, offers to sell, and sells infringing mobile phones to customers and potential customers located throughout the United States, within Texas, and in this District,. As just one example of

---

[1] *See*, *e.g.*, https://counterpointresearch.com/en/insights/us-smartphone-market-share.

[2] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 1 (PDF p. 4/59); *see also* https://investor.lenovo.com/en/global/home.php.

[3] https://www.lenovo.com/us/en/about/.

[4] *See, e.g.,* https://www.crn.com/news/computing/2025/lenovo-cuts-3-percent-of-us-workforce#:~:text=%5BRELATED:%20Lenovo%20Grows%20Annual%20Sales,5%2C000%E2%80%9D%20U.S.%2Dbased%20employees.

[5] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 1 (PDF p. 4/59).

[6] *Id.* at 188 (PDF p. 47/59).

many instances of LGL's purposeful placement of infringing mobile phones into the stream of commerce with the expectation and knowledge such products would be distributed throughout the U.S., Lenovo stated that the purpose of its acquisition of Motorola from Google was to "gain a strong market presence in North America."[7] Further, Lenovo's U.S. website directly sells infringing mobile phones to U.S. consumers.[8]

8.     The concerted action between LGL and its numerous subsidiaries, including LGL's Codefendants named herein, is so deep, and the degree of control LGL asserts over such subsidiaries and Codefendants is so dominant, that there is no practical distinction between LGL and its subsidiaries – as discussed above, they operate as a single entity called "Lenovo," "Lenovo Group," or the "Group." LGL's annual reports hold the Group out as a single company *hundreds* of times.[9] The Lenovo.com website also presents Lenovo as a single entity, uses the tagline "One Purpose. *One Lenovo.*" on the site's "About Lenovo" page,[10] identifies the leadership of "Lenovo" as officers of the Group – which, again, includes LGL *and* its subsidiaries –,[11] states that "*Lenovo* is incorporated and listed in Hong Kong SAR, China, with headquarters in Beijing, China, and *North Carolina, USA,*"[12] and identifies eight U.S.-based "Worldwide Sales Office Locations,"

---

[7]    *See*   https://news.lenovo.com/pressroom/press-releases/lenovo-to-acquire-motorola-mobility-from-google/#:~:text=Lenovo's%20acquisition%20of%20Motorola%20Mobility%20and%20its, Moto%20G%20and%20the%20DROID%20Ultra%20series.

[8] *See* https://www.lenovo.com/us/en/d/motorola-smartphones/.

[9] *See*, *e.g.*, Ex. 5 hereto at 16 (PDF p. 19/59) ("For the fiscal year ended March 31, 2025, Lenovo (*the Group*) delivered solid financial results.") (emphasis added) (also note 108 references to "the Group" in just the first 100 pages of the 2024/25 Annual Report).

[10] https://www.lenovo.com/us/en/about/ (emphasis added).

[11]   https://www.lenovo.com/us/en/about/who-we-are/our-leadership/?orgRef=https%253A%252F%252Finvestor.lenovo.com%252F.

[12] https://www.lenovo.com/us/en/about/locations/ (emphasis added).

including one in Fort Worth, Texas.[13] In LGL's 2024/25 Annual Report, Yuanqing Yang, Chairman and CEO of LGL,[14] referred to the "diverse and unified *One Lenovo* team around the world,"[15] echoing the company's "One Lenovo" tagline.[16] The deep concerted action between LGL and its numerous subsidiaries, including LGL's Codefendants named herein, and the dominant degree of control LGL asserts over such subsidiaries and Codefendants, in implementing the Group's "unified One Lenovo" business operation and in presenting that unified business operation to the worldwide and U.S. marketplaces is also demonstrated by the following description from LGL's 2024/25 Annual Report:

> Lenovo Group Limited (the "Company") and its subsidiaries (together, the "Group") develop, manufacture and market reliable, high-quality, secure and easy-to-use technology products and services. Its product lines include legendary Think-branded commercial personal computers and Idea-branded consumer personal computers, as well as servers, workstations, and a family of mobile internet devices, including tablets and smartphones.[17]

This statement confirms the obvious: LGL is ultimately responsible for, directs, controls, and acts in concert with its subsidiaries, including its Codefendants named herein, with respect to the "develop[ment], manufacture and market[ing]" of mobile phones, including the infringing products complained of herein.

---

[13] *Id.*

[14] *See, e.g.,* Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 144 (PDF p. 38/59) ("Mr. Yang Yuanqing, 60, is the Chairman of the Board, Chief Executive Officer and an executive director of *the Company*.") (emphasis added); *id.* at 1 (PDF p. 4/59) ("Lenovo Group Limited ('The Company') is the ultimate holding company of Lenovo Group.").

[15] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 11 (PDF p. 14/59) (emphasis added).

[16] *See*, *e.g.*, https://www.lenovo.com/us/en/about/ ("One Purpose. *One Lenovo.* Smarter Technology for All.") (emphasis added).

[17] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 179 (PDF p. 42/59).

9.    The deep concerted action between LGL and its subsidiaries, including LGL's Codefendants named herein, and the dominant degree of control LGL asserts over such subsidiaries and Codefendants, is not only demonstrated by the "unified One Lenovo" identity with which the Group presents itself to the worldwide and U.S. marketplaces but is also *required* by the "Corporate governance principles and structure" by which LGL and the Group it controls strictly abide. *First*, Mr. Yang, Chairman and CEO of LGL, directly leads the operations of not just LGL but also the operations of its numerous subsidiaries – including but not limited to LGL's Codefendants named herein – *i.e.*, collectively, "the Group."[18] For example, LGL's 2024-2025 Annual Report explains:

> The Board has reviewed the organization human resources planning of ***the Group*** and is of the opinion that for [sic] the vesting of the roles of Chairman and the CEO [of LGL] in Mr. Yang Yuanqing ("Mr. Yang") *is appropriate and beneficial to **the Group*** *as it provides consistency of the strategy execution and stability of the operations of **the Group***. The Board comprising a majority of independent non-executive directors meets regularly on a quarterly basis to review ***the operations of the Group led by Mr. Yang***.[19]

*Second*, Mr. Yang, in directly leading the operations of not just LGL but also the operations of its numerous subsidiaries – including but not limited to LGL's Codefendants named herein – *i.e.*, collectively, "the Group,"[20] "manages the business [of the Group] in line with the strategy agreed by the Board"[21] and

- "Formulates and recommends the strategy of the Group to the Board

- Executes the strategy [of the Group] agreed by the Board

- Makes and implements operational decisions and manages the business [of the Group] day-to-day

---

[18] *See*, *e.g.*, *id.* at 59 (PDF p. 32/59), *Corporate governance principles and structure*.

[19] *Id.* (parenthetical in original) (emphasis added).

[20] *Id.*

[21] *Id.* at 60 (PDF p. 33/59).

- Leads the business and the management team."[22]

*Third*, Mr. Yang, in directly leading the operations of LGL *and* its numerous subsidiaries – including but not limited to LGL's Codefendants named herein – *i.e.*, collectively, "the Group,"[23] "is supported by *the Lenovo Executive Committee*, which is a management committee comprising the CEO and *all senior management* and helps to implement strategy and manage operational performance" of the Group.[24] *Fourth*, as shown below in the excerpt of an organizational chart from LGL's 2024/25 Annual Report, every member of the Lenovo Executive Committee other than Mr. Yang – *i.e.*, "all senior management" of Lenovo – support and report directly to Mr. Yang as CEO of LGL:



*See* n.21 *supra* (yellow highlighting added). *Fifth*, as discussed in the paragraph below, Lenovo specifically identifies all members of Lenovo's senior management, each of whom supports and reports directly to Mr. Yang as CEO of LGL, as officers and managers of "the Group," which includes LGL and its subsidiaries.

---

[22] *Id.* at 62 (PDF p. 35/59).

[23] *Id.* at 59 (PDF p. 32/59).

[24] *Id.* at 60 (PDF p. 33/59) (emphasis added).

10.     Several of the executive officers and senior management who support and report directly to Mr. Yang as CEO of LGL – identified as "Leadership,"[25] members of the "Lenovo management team,"[26] and "senior management" [27] "*of the Group*" (*id.* n.27 (emphasis added)) – work from and reside in the United States, including in Texas. For example, Matthew Zielinski, "Executive Vice President *of the Group* and President of the International Sales Organization *of the Group*" (*see* n.27 *supra* (emphasis added); *see also* n.26 *supra*), "the leader of *Lenovo's* International Sales Organization since 2021" (*see* n.25 *supra* (emphasis added)), and a member of "senior management" (*see* n.27 *supra*), resides in Austin, Texas.[28] Ashley Gorakhpurwalla, "Executive Vice President of *the Group*, President of the Infrastructure Solutions Group (ISG)[,]" (*see* n.27 *supra* (emphasis added); *see also* nn.25-26 *supra*), "a member of *Lenovo's* Executive Committee" (*see* n.25 *supra* (emphasis added)), and a member of "senior management" (*see* n.27 *supra*), resides in Austin, Texas.[29] David Carroll, "Senior Vice President *of the Group* and the Chief Legal and Corporate Responsibility Officer ('CLO') for *the Group's* legal, IP, government relations, and ESG matters globally" (*see* n.27 *supra* (emphasis added); *see also* nn.25-26 *supra*), and a member of "senior management" (*see* n.27 *supra*), resides in Lake Zurich, Illinois.[30] Tolga Kurtoglu, "Senior Vice President, Chief Technology Officer[,] and Lenovo Technology

---

[25] https://www.lenovo.com/us/en/about/who-we-are/our-leadership/?orgRef=https%253A%252F%252Finvestor.lenovo.com%252F.

[26] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 12-13 (PDF pp. 15-16/59).

[27] *Id.* at 148-50 (PDF pp. 39-41/59).

[28] Ex. 6 hereto, Matthew Zielinski's LinkedIn Profile; *see also* https://www.linkedin.com/in/matthew-zielinski/.

[29] Ex. 7 hereto, Ashley Gorakhpurwalla's LinkedIn Profile; *see also* https://www.linkedin.com/in/ashley-gorakhpurwalla-b602b2b/.

[30] Ex. 8 hereto, David Carroll's LinkedIn Profile; https://www.linkedin.com/in/david-carroll-013464/.

Committee Vice-Chair *of the Group*[,]" (*see* n.27 *supra* (emphasis added), a "*Lenovo* Executive Committee member … [who] leads *Lenovo's* corporate technology strategy and R&D planning & governance" (*see* nn.25-26 *supra* (emphasis added)), is a member of "senior management" (*see* n.27 *supra*), and resides in the San Francisco Bay Area.[31] Doug Fisher, "*Lenovo's* Senior Vice President and Chief Security and AI Officer" (*see* n.25 *supra* (emphasis added)), resides in Henderson, Nevada.[32] Arthur Hu, "*Lenovo's* Global CIO" (*see* n.25 *supra* (emphasis added)), resides in Seattle, Washington.[33] According to the definitions LGL presents to the world in its 2024/25 Annual Report, each of the senior managers of *the Group* identified above, acting in their respective leadership and management roles with *the Group*, serve in those roles as leaders and managers of LGL *and* its subsidiaries. Indeed, "Lenovo or 'Lenovo Group' or the 'Group' refers to *Lenovo Group Limited together with its subsidiaries*." (*See* n.2 *supra* (emphasis added).)

11.     The deep concerted action between LGL and its subsidiaries, including LGL's Codefendants named herein, and the dominant degree of control LGL asserts over such subsidiaries and Codefendants, is further demonstrated by stock ownership guidelines that require "senior management" – again, all of whom support and report directly to Mr. Yang as CEO of LGL and all of whom Lenovo holds out to be officers and senior management of *the Group*, and thus of LGL *and* its subsidiaries – to purchase and maintain ownership of shares of LGL stock (the ownership guideline levels of which are calculated and expressed as a multiple of an executive's or senior manager's base salary).[34] LGL also imposes

---

[31] Ex. 11 hereto, Tolga Kurtoglu's LinkedIn Profile; https://www.linkedin.com/in/tolga-kurtoglu/.

[32] Ex. 9 hereto, Doug Fisher's LinkedIn Profile; https://www.linkedin.com/in/doug-fisher-8534092/.

[33] Ex. 10 hereto, Arthur Hu's LinkedIn Profile; https://www.linkedin.com/in/arthur-hu-b29125/.

[34] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 136 (PDF p. 37/59).

a claw back policy for selected executives, including the Chairman/CEO and *senior management*. The policy states that in the event of a restatement of the Company's [*i.e.*, LGL's] previously issued financial statements as a result of errors, omission, fraud or noncompliance, the Board may, in its discretion, attempt to recover all or a portion of compensation, with respect to any financial year in which the Company's financial results are negatively affected by such restatement.[35]

Thus, with its stock ownership and compensation claw-back policies, LGL asserts substantial financial control over individuals who serve as senior management of LGL's subsidiaries as well as of LGL itself. (*See* n.2 *supra* ("Lenovo or 'Lenovo Group' or the 'Group' refers to *Lenovo Group Limited together with its subsidiaries*.") (emphasis added).)

12.    The deep concerted action between LGL and its subsidiaries, including LGL's Codefendants named herein, and the dominant degree of control LGL asserts over such subsidiaries and Codefendants, is further demonstrated by LGL's 2024/25 Annual Report, which confirms that Lenovo "[s]ubsidiaries are all entities … over which the Group has control. The Group controls an entity when the Group is exposed to, or has rights to, variable returns from its involvement with the entity and has the ability to affect those returns *through its power to direct the activities of the entity*."[36] All of LGL's Codefendants named herein are identified in the 2024/25 Annual Report as "[p]rincipal subsidiaries" of LGL.[37] Thus, the Group has control over each of the Codefendants.

13.    The deep concerted action between LGL and its subsidiaries, including LGL's Codefendants named herein, and the dominant degree of control LGL asserts over such subsidiaries and Codefendants, is further demonstrated by LGL's almost absolute ownership of

---

[35] *Id.* (emphasis added).

[36] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 180 (PDF p. 43/59) (emphasis added).

[37] *Id.* at 259-263 (PDF pp. 51-55/59).

each of the Lenovo entities – including LGL's Codefendants named herein – with which it coordinates the infringing sale, offer for sale, import, use, and manufacture of infringing products in the United States. Specifically, LGL, as "the ultimate holding company of Lenovo Group," [38] owns 100% of Codefendants Lenovo (Beijing) Limited, Motorola Mobile Communication Technology Ltd., and Motorola (Wuhan) Mobility Technologies Communication Company Limited. LGL also owns 100% of five principal subsidiaries located in the U.S.[39]

14.    As part of coordinating concerted action with, and in asserting dominant control over, its subsidiaries, including its Codefendants named herein, LGL operates and manages a global supply chain to develop, manufacture, and deliver to the United States, including Texas, infringing mobile products. At the direction or control of LGL, infringing products are packaged, shipped, and sold to customers in the United States. LGL reports U.S. sales of infringing products as its own.[40] LGL does not identify mobile phone revenue for any particular subsidiary; rather, it simply identifies mobile phone revenue as "Motorola-branded revenue."[41] Further, "Lenovo Group [which consists of ultimate parent LGL and its subsidiaries and Codefendants over which LGL has control] operates a highly complex, global supply chain…" that delivers infringing

---

[38] *Id.* at 1 (PDF p. 4/59) ("Lenovo Group Limited ('The Company') is the ultimate holding company of Lenovo Group.").

[39] *Id.* at 261 (PDF p. 53/59) (showing LGL's 100% ownership of U.S.-based "Lenovo Global Technology (United States) Inc."); 263 (PDF p. 55/59) (100% ownership of U.S.-based "Lenovo (United States) Inc."); 264 (PDF p. 56/59) (100% ownership of U.S.-based "Motorola Mobility International Sales LLC"); *id.* (100% ownership of U.S.-based "Motorola Mobility LLC"); *id.* (100% ownership of U.S.-based "Stoneware, Inc."); *see also* Ex. 18 hereto, *Lenovo Manufacturing Sites and Suppliers* at 1 (listing "inhouse manufacturing site" in "Whitsett, USA").

[40] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 188 (PDF p. 47/59) (reporting revenue for "Americas" as part of the Group's total 2025 revenue of US$69 million); 180 (PDF p. 43/59) (stating that "[t]he consolidated financial statements include the financial statements of the Company and all of its subsidiaries … over which the Group has control").

[41] *Id.* at 18 (PDF p. 21/59).

products to the U.S. market and customers in the U.S.[42] Further still, LGL advertises that it manufactures most of its products in its own facilities, rather than through third parties. For example, on its website, Lenovo states: "We manufacture the majority of our products in our own facilities—more than most other hardware suppliers. This hybrid model helps us bring new innovations to market efficiently while having greater control over product development and supply chain for advantages in quality, security, and time-to-market. Recently, Gartner ranked us #15 on their list of Top 25 World Class Supply Chains."[43] On June 23, 2025, Lenovo posted a press release on its website announcing that "Lenovo ranks 8th in the Gartner® Supply Chain Top 25 for 2025."[44] In the press release, Lenovo stated that "Lenovo's supply chain spans over 30 manufacturing sites in 11 markets across the Asia Pacific, China, Europe, the Middle East and Africa, North America, and South America regions," and "Lenovo's global manufacturing footprint provides the ultimate flexibility and resilience, enabling the company to respond quickly and navigate any global situation effectively."[45]

15.    The factual contentions ImberaTek sets forth below concerning LGL's Codefendant subsidiaries have specific evidentiary support as alleged or, "if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery…." Fed. R. Civ. P. 11(b)(3).

16.    Lenovo (Beijing) Limited ("Lenovo Beijing") is a company organized under the laws of China. Lenovo Beijing has an office at No. 6, Chuangye Road, Shangdi, Haidan District,

---

[42] *See*, *e.g.*, *id.* at 25 (PDF p. 28/59).

[43] https://www.lenovo.com/in/inpartners/instudentstore/en/about/whoweare .

[44] https://news.lenovo.com/pressroom/press-releases/lenovo-ranks-8th-in-the-gartner-supply-chain-top-25-for-2025/.

[45] *Id.*

Beijing 100085, China. Lenovo Beijing may be served with process pursuant to the provisions of the Hague Convention. Lenovo Beijing may also be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute. This action arises out of the business in which Lenovo Beijing engages in Texas.

17.     According to LGL's 2024/25 Annual Report, Lenovo Beijing is a principal subsidiary of LGL, is 100% owned by LGL, and is engaged in the "[p]rincipal activities" of "[m]anufacturing and distribution of IT products and provision of IT services."[46] Upon information and belief, Lenovo Beijing acts at the instruction and direction and under the supervision and control of, and in concert with, LGL to make, sell, offer for sale, and import infringing products in or for the United States.[47] For example, Lenovo Beijing is the registrant of www.lenovo.com, through which the Defendants sell infringing products directly to customers in the United States. On further information and belief, Lenovo Beijing operates the "Beijing Data Center to support Lenovo global core business." Upon information and belief, Lenovo Beijing, operating in concert with LGL and Codefendants, hosts Lenovo.com, the Group's primary website from which it projects itself to the world as the single entity "Lenovo"[48] under the tag line "One

---

[46] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 259 (PDF p. 51/59).

[47] As a principal subsidiary of LGL, Lenovo Beijing is controlled by LGL. *See* Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 180 (PDF p. 43/59) ("Subsidiaries are all entities … over which the Group has control."); *id.* at 1 (PDF p. 4/59) ("Lenovo Group Limited ('The Company') is the ultimate holding company of Lenovo Group").

[48] Ex. 12 hereto, ICANN Lookup for Lenovo.com (listing "Lenovo Beijing Limited" as the "Registrant … Organization" for the domain).

Purpose. *One Lenovo*,"[49] boasts of its "*unified* One Lenovo team around the world,"[50] and offers for sale and sells hundreds of products including, among others, infringing mobile phones, to customers throughout the United States, including in Texas and this District.[51]

18.    ImberaTek states, on information and belief, formed after an inquiry reasonable under the circumstances, that a reasonable opportunity for further investigation and discovery will provide additional, specific evidentiary support confirming that Lenovo Beijing makes, markets, distributes, sells, offers to sell, and imports in or for the United States, infringing mobile phones. *See* Fed. R. Civ. P. 11(b)(3).

19.    Lenovo (Thailand) Limited ("Lenovo Thailand") is a company organized under the laws of Thailand. Lenovo Thailand has an office at 12th Floor, AIA Capital Center Building, No. 89 Ratchadaphisek Rd. Khwaeng Din Daeng, Khet Din Daeng, Bangkok 10400, Thailand, and may be served with process pursuant to international agreement. Lenovo Thailand may also be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute. This action arises out of the business in which Lenovo Thailand engages in Texas.

20.    According to LGL's 2024/25 Annual Report, Lenovo Thailand is a principal subsidiary of LGL, is owned 100% by LGL, and is engaged in the "[p]rincipal activities" of the "[d]istribution of IT products as well as mobile phone, smartphone and tablet, server and

---

[49] https://www.lenovo.com/us/en/about/ (emphasis added).

[50] *See* Ex. 5 at 11 (PDF p. 14/59) (LGL CEO Mr. Yang's reference to a "unified One Lenovo team around the world") (emphasis added).

[51] *See*, *e.g.*, https://www.lenovo.com/us/en/d/motorola-smartphones/.

storage."[52] Upon information and belief, Lenovo Thailand acts at the instruction and direction and under the supervision and control of, and in concert with, LGL[53] and/or other LGL subsidiaries/affiliates to make, sell, offer for sale, and import infringing products in or for the United States, including mobile phone products. ImberaTek states, on information and belief, formed after an inquiry reasonable under the circumstances, that a reasonable opportunity for further investigation and discovery will provide additional, specific evidentiary support confirming that Lenovo Thailand makes, markets, distributes, sells, offers to sell, and imports in or for the United States infringing mobile phones as described more fully below. *See* Fed. R. Civ. P. 11(b)(3).

21.    Motorola Mobile Communication Technology Ltd. ("Motorola MCT") is a company organized under the laws of China. Motorola MCT may be served with process pursuant to the provisions of the Hague Convention. Motorola MCT may also be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute. This action arises out of the business in which Motorola MCT engages in Texas.

22.    According to LGL's 2024/25 Annual Report, Motorola MCT is a principal subsidiary of LGL, is owned 100% by LGL, and is engaged in the "[p]rincipal activities" of "[m]anufacturing and distribution of IT products and provision of IT services."[54] Upon information and belief, Motorola MCT acts at the instruction and direction and under the

---

[52] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 263 (PDF p. 55/59).

[53] As a principal subsidiary of LGL, Lenovo Thailand is controlled by LGL. *See* Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 180 (PDF p. 43/59) ("Subsidiaries are all entities … over which the Group has control."); *id.* at 1 (PDF p. 4/59) ("Lenovo Group Limited ('The Company') is the ultimate holding company of Lenovo Group").

[54] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 262 (PDF p. 54/59).

supervision and control of, and in concert with, LGL[55] and/or other LGL subsidiaries/affiliates to sell, offer for sale, import, use, and make infringing mobile phone products in the United States and/or for the United States market. ImberaTek states, on information and belief, formed after an inquiry reasonable under the circumstances, that a reasonable opportunity for further investigation and discovery will provide additional, specific evidentiary support confirming that Motorola MCT makes, markets, distributes, sells, offers to sell, and imports in or for the United States infringing mobile phones as described more fully below. *See* Fed. R. Civ. P. 11(b)(3).

23.     Motorola (Wuhan) Mobility Technologies Communication Company Limited ("Motorola Wuhan") is a company organized under the laws of China, with a principal place of business located at No. 19, Gaoxin 4th Road, Donghu New Technology Development Zone Wuhan, Hubei, 430205 China. Motorola Wuhan may be served with process pursuant to the provisions of the Hague Convention. Motorola Wuhan may also be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute. This action arises out of the business in which Motorola Wuhan engages in Texas.

24.     According to LGL's 2024/25 Annual Report, Motorola Wuhan is a principal subsidiary of LGL, is owned 100% by LGL, and is engaged in the "[p]rincipal activities" of "[m]anufacturing of mobile products."[56] Upon information and belief, Motorola Wuhan acts at the

---

[55] As a principal subsidiary of LGL, Motorola MCT is controlled by LGL. *See* Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 180 (PDF p. 43/59) ("Subsidiaries are all entities … over which the Group has control."); *id.* at 1 (PDF p. 4/59) ("Lenovo Group Limited ('The Company') is the ultimate holding company of Lenovo Group").

[56] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 262 (PDF p. 54/59).

instruction and direction and under the supervision and control of, and in concert with, LGL[57] and/or other LGL subsidiaries/affiliates to sell, offer for sale, import, use, and make infringing mobile phone products in the United States and/or for the United States market. By way of example but not limitation, publicly available bill of lading information confirms that Motorola imports, and has in the past imported, into the United States Motorola-branded products including at least mobile phones.[58] ImberaTek states, on information and belief, formed after an inquiry reasonable under the circumstances, that a reasonable opportunity for further investigation and discovery will provide additional, specific evidentiary support confirming that Motorola Wuhan makes, markets, distributes, sells, offers to sell, and imports in or for the United States infringing mobile phones as described more fully below. *See* Fed. R. Civ. P. 11(b)(3).

25.    As discussed above, the Defendants are companies that together – with their affiliates – comprise one of the world's leading manufacturers of computers and computer-related products. Together, Defendants design, manufacture, use, sell, offer to sell, and import in or for the United States infringing mobile phones. Lenovo products, including the products accused of infringement herein, are marketed, offered for sale, sold, and imported throughout the United States, including within this District.

26.    As discussed above, Defendants and their affiliates are part of the same corporate structure and distribution chain for the making, importing, offering to sell, selling, and using of

---

[57] As a principal subsidiary of LGL, Motorola Wuhan is controlled by LGL. *See* Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 180 (PDF p. 43/59) ("Subsidiaries are all entities … over which the Group has control."); *id.* at 1 (PDF p. 4/59) ("Lenovo Group Limited ('The Company') is the ultimate holding company of Lenovo Group").

[58] *See, e.g.,* Ex. 13 (short form bills of lading showing representative examples of Motorola Wuhan's importation into the U.S. of "Mobile Phone[s]," including, on information and belief, the 2021 Moto G Stylus (Xt2131-1), 2021 Motorola Edge (Xt2141-1), 2023 Moto G Stylus 5G (Xt2315-5; Xt2315-1), 2022 Motorola Edge (Xt2205-3), 2023 Moto G 5G (Xt2313-4), 2024 Moto G 5G (Xt2417-2), and 2024 Moto G Stylus 5G (Xt2419-3)).

infringing products in the United States, including in the State of Texas generally, and this District in particular. Defendants engage in coordinated and concerted action to direct infringing products to customers throughout the United States, including Texas.

27.     As discussed above, Defendants and their affiliates share the same senior management, common ownership, advertising platforms, facilities, distribution chains and platforms, and infringing product lines and products involving related technologies.

28.     In the product naming and branding, promotional materials, manuals, guides, terms of use, sales agreements, warranties, or similar documentation related to infringing Lenovo-branded products, the Group regularly omits which specific Lenovo company or entity is responsible for the documents or associated products, or instead simply identifies "Lenovo" or the "Lenovo Group." As a result, customers of infringing Lenovo-branded products understand that LGL or the Lenovo Group as a whole, makes and sells the infringing products. Customers' understandings in this regard are consistent with the "unified One Lenovo team around the world" of which LGL's CEO Mr. Yang boasts.[59] The Group even creates similar – albeit somewhat less pervasive – confusion with respect to the distinction between Group entities bearing the "Motorola" and "Lenovo" names. In this regard, for example, a Motorola website advertises, offers to sell, and sells the "Lenovo Tab P11 (Gen 2)" tablet laptop computer. (*See* https://www .motorola.com/us/en/p/phones/moto-e/lenovo-tab-p11/zzitztatb7j?srsltid=AfmBOoqnaLmG w587u4OGEPdCAkKBLApcuX_1AJO10qxuMQx3_76y5LX9&pn=ZABF0309US.)

29.     LGL, and Lenovo as a whole, holds itself out as the entity that manufactures, sells, offers to sell, imports, and uses infringing products in the United States, including Texas. For

---

[59] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 11 (PDF p. 14/59).

example, the privacy statement of www.lenovo.com states that "[t]his privacy statement applies to data collected through websites owned and operated by LGL and its affiliated group companies including Motorola ("Lenovo")."[60] Lenovo sells and offers for sale products through its U.S. website, and "Lenovo" (*i.e.*, "Lenovo Group Limited and its affiliated group companies"). Those sales are subject to the terms of a "Lenovo Sales Agreement," which applies to and is binding on all customers, including customers within the United States and Texas.[61] LGL, and Lenovo as a whole, sell the "Accused Products" as defined below directly to customers in the United States, including within Texas, through www.lenovo.com/us/en.

30.    The "Accused Products," as defined below, are also sold and offered for sale by Lenovo, including under the control of and in concert with the Defendants, to customers in the United States, Texas, and this District, through www.motorola.com.[62]

31.    Defendants and their affiliates operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein.

32.    On information and belief, Defendants directly and/or indirectly develop, design, manufacture, distribute, market, offer for sale, and/or sell in, or import into, the United States the infringing products, including in the Eastern District of Texas, and otherwise direct infringing activities to this District in connection with their products and services.

33.    As discussed above, the deep concerted action between LGL and its numerous subsidiaries, including LGL's Codefendants named herein, and the dominant degree of control LGL asserts over such subsidiaries and Codefendants eliminates any practical distinction between

---

[60] *See* https://www.lenovo.com/us/en/privacy/. *See also* lenovo.com/us/en/legal/ ("The following are terms between you and Lenovo ('we,' 'us,' or 'our').")

[61] https://www.lenovo.com/us/en/terms-and-conditions/.

[62] *See, e.g.,* https://www.motorola.com/us/en/smartphones.

LGL, Codefendants, and LGL's other subsidiaries as confirmed by their advertisement to the public, and practical operation, as a single entity to which they refer as the "Group" or the "Lenovo Group." The Group's public-facing website, Lenovo.com, and the hundreds of webpages to which the main site provides links, make no distinction between various Lenovo entities and insinuate the Group is a single company. LGL's "One Lenovo" tagline perfectly suits LGL and the Group's "One Lenovo" approach to every aspect of their business. Thus, although LGL owns almost 100% of each of its subsidiaries, including LGL's Codefendants named herein, it presents itself as – and is – much more than a holding company.

## JURISDICTION, VENUE, AND JOINDER

34.    This Court has subject matter jurisdiction over ImberaTek's claims of infringement of the Asserted Patents pursuant to 28 U.S.C. §§ 1331 (federal question), 1338 (action arising under an Act of Congress relating to patents), 2201 (creation of remedy), and 2202 (further relief). Certain claims in this Action arise under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

35.    This Court has personal jurisdiction over Defendants. As alleged above with respect to each Defendant, individually, and as alleged above with respect to all Defendants, collectively, and acting in concert with one another, and at the instruction and direction and under the supervision and control of, and in concert with, LGL, Defendants regularly conduct business and have committed acts of patent infringement and/or have induced acts of patent infringement by others in this Judicial District and/or have contributed to patent infringement by others in this Judicial District, the State of Texas, and elsewhere in the United States. Defendants, directly and/or through subsidiaries or intermediaries, have committed and continue to commit acts of infringement in this District by, among other things, making, using, importing, offering to sell, and/or selling products that infringe the Asserted Patents. Courts in Texas, including within this

Judicial District, have concluded that Lenovo is subject to personal jurisdiction in the State of Texas. *See ACQIS LLC v. Lenovo Grp. Ltd.*, 572 F. Supp. 3d 291, 307 (W.D. Tex. 2021) ("[T]his Court finds that the exercise of personal jurisdiction over [LGL] is both reasonable and fair."); *see also AX Wireless LLC v. Lenovo Grp. Ltd.*, No. 2:22-cv- 00280-RWS-RSP, Dkt. No. 110 (report and recommendation) (E.D. Tex. Sept. 6, 2023) ("exercising personal jurisdiction [over LGL] would not offend traditional notions of fair place and substantial justice").

36.     The Defendants have induced, and continue to, induce their subsidiaries, affiliates, shippers, retail partners, and customers to make, use, sell, offer for sale, and/or import in or for the United States, including within this Judicial District, infringing products and place such products into the stream of commerce via established distribution channels, knowing or understanding that such products would be imported, sold, and used in the United States and that such products infringe the Asserted Patents, including in the Eastern District of Texas. The Defendants purposefully direct the infringing products identified herein into established distribution channels within this District and the U.S. nationally. For example, Lenovo sells and offers to sell the infringing products through its websites, Lenovo.com[63] and Motorola.com, which may be accessed throughout the United States, the State of Texas, and this Judicial District. Thus, in addition to their acts of direct and indirect infringement as described throughout this Complaint, the Defendants have also committed acts of indirect infringement at least by manufacturing products for the U.S. market, and/or directing them to the U.S. market, knowing they will cause infringement through import, sale, and/or use in the United States. *See, e.g., Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1302-03 (Fed. Cir. 2012) ("[W]here a foreign party, with the requisite

---

[63] The Lenovo website is maintained by Defendant Lenovo Beijing. *See* https://www.whois.com/whois/lenovo.com.

knowledge and intent, employs extraterritorial means to actively induce acts of direct infringement that occur within the United States, such conduct is not categorically exempt from redress under § 271(b).").

37.     The Defendants have authorized sellers and sales representatives that offer for sale and sell infringing products throughout the State of Texas and to consumers throughout this District, including, on information and belief, at the following locations in this District: Best Buy, 5514 S. Broadway Avenue, Tyler, TX 75703; Best Buy, 422 West Loop 281, Longview, TX, 75605; Wal-Mart, 1701 East End Boulevard North, Marshall, TX 75670; T-Mobile, 116 East Loop 281, Suite 101, Longview, TX 75605.

38.     Based on the Defendants' connections and relationships with these retailers and digital distribution platforms, the Defendants know that Texas is a termination point of their established distribution channels, including the online as well as physical stores offering Lenovo and Motorola products to users in Texas. The Defendants, therefore, have purposefully directed their activities at the State of Texas, and should reasonably anticipate being brought before this Court.

39.     The Defendants are also subject to this Court's personal jurisdiction because each Defendant, directly, through, or in concert with subsidiaries, affiliates, or intermediaries, including such Defendant's Codefendants named herein, some or all of which Codefendants are such Defendant's agents and/or alter egos as discussed more fully above, makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products within the State of Texas and this District that infringe one or more claims of the Asserted Patents owned by ImberaTek, as alleged more fully below.

40.    As also discussed above, throughout LGL's 2024/25 Annual Report, LGL repeatedly refers to itself and its subsidiaries collectively as "Lenovo," "the Company," "Lenovo Group," and/or "the Group,"[64] and fails to distinguish its activities from its subsidiaries. Further, LGL fully owns each Codefendant.[65] For these reasons as well, LGL's Codefendant/subsidiaries are agents or alter egos of LGL.

41.    In the alternative, this Court has personal jurisdiction over the Defendants under Federal Rule of Civil Procedure 4(k)(2), because the claims for patent infringement in this action arise under federal patent law, the Defendants are not subject to the jurisdiction of the courts of general jurisdiction of any state, and exercising jurisdiction over the Defendants is consistent with the United States Constitution.

42.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 because, among other things, the Defendants are not residents in the United States and thus may be sued in any judicial district pursuant to 28 U.S.C. § 1391(c)(3).

43.    The Defendants make, use, sell, offer for sale, and/or import infringing products into and/or within this District, maintain a permanent and/or continuing presence within this District, and/or have the requisite minimum contacts with this District such that venue in this District is fair and reasonable. On information and belief, the Defendants have transacted and, as of the time of the filing of this Complaint, are continuing to transact business within this District.

44.    The Defendants are properly joined in this action pursuant to 35 U.S.C. § 299(a) because (1) ImberaTek herein has asserted rights to relief against the Defendants jointly, severally,

---

[64] Ex. 5 hereto, Lenovo Group Limited 2024/25 Annual Report at 1 (PDF p. 4/59); *see also* https://investor.lenovo.com/en/global/home.php.

[65] *Id.* at 259-265 (PDF pp. 51-57/59) (listing "100%" as LGL's "[p]ercentage of issued share capital held" with respect to its "[p]rincipal subsidiaries," which include LGL's Codefendants named herein).

and in the alternative with respect to or arising out of the same series of transactions or occurrences relating to the making, using, importing into the United States, offering for sale, or selling the same accused products; and (2) questions of fact common to all of the Defendants will arise in this action.

## **FACTUAL ALLEGATIONS**

### A.    **Background**

45.     This lawsuit involves significant, groundbreaking advancements in the manufacturing of semiconductor devices. These innovations were developed by Imbera Electronics Oy, a pioneering Finnish company which started to develop embedded electronics packaging technology and manufacturing solutions decades ago. Over the years, these innovations have enabled significant advancements in the field.

46.     The Asserted Patents are generally directed to novel and non-obvious techniques to leverage semiconductors in electronic modules such as printed circuit boards and package substrates. The inventions of the Asserted Patents provide technical, manufacturing, and economical advantages by, for example, designing an electronic module with solid bump contact zones to improve a conductive-pattern layer (485 Patent at 2:62-5:35) and manufacturing components with specific contact surfaces (324 Patent at 3:10-4:41, 194 Patent at 1:48-2:56, 587 Patent at 3:15-4:50).

### B.    **The Asserted Patents**

47.     The 194 Patent is titled "Circuit Board Including An Embedded Component" and issued on July 16, 2013. The named inventors on the 194 Patent are Risto Tuominen and Petteri Palm. A true and correct copy of the 194 Patent is attached hereto as Exhibit 1.

48.     The 485 Patent is titled "Single-Layer Component Package" and issued on August 26, 2014. The 485 Patent is a continuation-in-part of U.S. Patent No. 7,609,527 (the "527 Patent"). The named inventors on the 485 Patent are Risto Tuominen and Petteri Palm. A true and correct copy of the 485 Patent is attached hereto as Exhibit 2.

49.     The 324 Patent is titled "Circuit Module and Method of Manufacturing the Same" and issued on August 11, 2015. The named inventors on the 324 Patent are Petteri Palm, Risto Tuominen, and Antti Iihola. A true and correct copy of the 324 Patent is attached hereto as Exhibit 3.

50.     The 587 Patent is titled "Circuit Module and Method of Manufacturing the Same" and issued on January 30, 2018. The 587 Patent is a continuation of the 324 Patent. The named inventors of the 587 Patent are Petteri Palm, Risto Tuominen, and Antti Iihola. A true and correct copy of the 587 Patent is attached hereto as Exhibit 4.

51.     ImberaTek is the owner of all rights, title, and interest in and to the Asserted Patents. ImberaTek possesses all rights to sue and recover past and future damages for any infringement of the Asserted Patents.

## C.     The Accused Products and Infringing Activities

52.     On information and belief, Defendants offer or have offered numerous infringing products, including but not limited to, the 2020 Motorola Edge, 2020 Motorola Razr 5G, 2021 Motorola Moto G Stylus 5G, 2021 Motorola Edge, 2022 Motorola Moto G Stylus 5G, 2024 Motorola Moto G Stylus 5G, 2021 Motorola Edge 5G UW, 2024 Motorola Edge, 2024 Motorola Razr+, 2025 Motorola Razr Ultra, 2023 Motorola Moto G Stylus 5G, 2025 Motorola Moto G Stylus, 2023 Motorola Edge+, 2023 Motorola Razr, 2023 Motorola Razr+, 2023 Motorola Moto G 5G, 2022 Motorola Edge+, and 2025 Motorola Razr+ (the "Accused Products"), which include

one or more infringing Power Management Integrated Circuits ("PMICs"), including without limitation PMIC component model numbers PM6150L, PM6150C, PM6350, PM6375, PM6450, PM7250, PM7250B, PM7350C, PM8350, PM8350B, PM8350C, PM8450, PM8550BH, and 4C3. *See* Exhibits 19-64.

53.    For example and without limitation of the foregoing, on information and belief, the 2020 Edge and 2020 Razr include the PM7250 and PM7250B PMICs, the 2021 Moto G Stylus includes the PM6150L, PM7250B, and PM6350 PMICs, the 2021 Edge and 2021 Edge 5G UW include the PM7350C PMIC, the 2022 Moto G Stylus includes the PM6375 PMIC, the 2022 Edge+ includes the PM8350, PM8350C, and PM8450 PMICs, the 2023 Edge+ includes the PM8550BH PMIC, the 2024 Edge includes the PM6150C, PM6450, and PM8350B PMICs, the 2023 Razr includes the PM7350C PMIC, the 2023 Razr+ includes the PM8350, PM8350C, and PM8450 PMICs, the 2024 Razr+ and 2025 Razr+ include the PM8550BH PMIC, the 2025 Razr Ultra includes the 4C3 PMIC, the 2023 Moto G includes the PM6375 PMIC, the 2023 Moto G Stylus includes the PM6150C, PM6450, and PM7250B PMICs, the 2025 Moto G Stylus includes the PM6150C, PM6450, and PM8350B PMICs, and the 2024 Moto G Stylus includes the PM6150C, PM6450, and PM7250B PMICs.

54.    For example and without limitation of the foregoing, and on information and belief, Defendants began offering the 2024 Motorola Edge for sale in the United States in 2024[66] and have been, and are currently, selling, and supporting the use of, the 2024 Motorola Edge in the United States.[67]

---

[66] https://motorolanews.com/built-for-all-of-lifes-adventures-meet-the-new-motorola-edge-2024/.
[67] https://www.motorola.com/us/en/p/phones/motorola-edge/edge-gen5/pmipmgm36mw?pn=PB0T0003US.

55.     As another example and without limitation of the foregoing, and on information and belief, Defendants began offering the 2024 Motorola Razr+ for sale in the United States in 2024[68] and have been, and are currently, selling, and supporting the use of, the 2024 Motorola Razr+ in the United States.[69]

56.     As another example and without limitation of the foregoing, and on information and belief, Defendants began offering the 2023 Motorola Moto G Stylus for sale in the United States in 2023[70] and have been, and are currently, selling, and supporting the use of, the 2023 Motorola Moto G Stylus in the United States.[71]

57.     As another example and without limitation of the foregoing, and on information and belief, Defendants began offering the 2025 Motorola Moto G Stylus for sale in the United States in 2025[72] and have been, and are currently, selling, and supporting the use of, the 2025 Motorola Moto G Stylus in the United States.[73]

58.     As another example and without limitation of the foregoing, and on information and belief, Defendants began offering the 2023 Motorola Edge+ for sale in the United States in

---

[68] https://motorolanews.com/new-motorola-razr-family-2024/.

[69]     https://www.motorola.com/us/en/p/phones/razr/razr-plus-gen-2/pmipmgs38mh?pn=PB2J0010US.

[70]     https://motorolanews.com/unlock-precision-and-performance-with-the-new-moto-g-stylus-and-moto-g-5g/.

[71]https://www.motorola.com/us/en/p/phones/moto-g/g-stylus-gen-4/pmipmfz35ma?srsltid=AfmBOooqy9tBXev0s2Pfoj1B9DH91WI5cDtFNGHX16NkuXcDjT_YJhI2&pn=PAXW0007US.

[72] https://motorolanews.com/creativity-meets-durability-in-the-new-moto-g-stylus-2025/.

[73]https://www.motorola.com/us/en/p/phones/moto-g/g-stylus-gen-5/pmipmhl40me?srsltid=AfmBOorrOcdcqXQ7eKec7GShnfVfBxaTL6l_ryl798Z-UK3ck_Kf80i3&pn=PB6V0019US.

2023[74] and have been, and are currently, selling, and supporting the use of, the 2023 Motorola Edge+ in the United States.[75]

59.     As another example and without limitation of the foregoing, and on information and belief, Defendants began offering the 2023 Motorola Razr for sale in the United States in 2023[76] and have been, and are currently, selling, and supporting the use of, the 2023 Motorola Razr in the United States.[77]

60.     As another example and without limitation of the foregoing, and on information and belief, Defendants began offering the 2023 Motorola Razr+ for sale in the United States in 2023[78] and have been, and are currently, selling, and supporting the use of, the 2023 Motorola Razr+ in the United States.[79]

61.     As another example and without limitation of the foregoing, and on information and belief, Defendants began offering the 2023 Motorola Moto G 5G for sale in the United States

---

[74]     https://motorolanews.com/fluid-design-cutting-edge-camera-meet-the-new-motorola-edge-2023/.

[75]https://www.motorola.com/us/en/p/phones/motorola-edge/edge-gen-4/pmipmgb35mi?pn=PAY60004US&bvstate=pg%3A2%2Fct%3Ar&srsltid=AfmBOop_GSoyUBmN9GxAgoYekzAMgFf-JyZ0-q6fUa7yso9icrR17U-8.

[76] https://motorolanews.com/foldable-fun-for-everyone-introducing-the-new-motorola-razr/.

[77]         https://en-us.support.motorola.com/app/answers/detail/a_id/176643/~/specifications---motorola-razr---2023.

[78]     https://news.lenovo.com/pressroom/press-releases/reimagine-possibilities-new-motorola-razr-family/.

[79]https://www.motorola.com/us/en/p/phones/razr/razr-plus/pmipmfu34mm?srsltid=AfmBOoqDlp5bWKNRrfJnRMwnf8x95Aj7xsHikwLqOs6DSTCT3rZlx1aI&pn=PAX60001US.

in 2023[80] and have been, and are currently, selling, and supporting the use of, the 2023 Motorola Moto G 5G in the United States.[81]

62.    As another example and without limitation of the foregoing, and on information and belief, Defendants began offering the 2022 Motorola Edge+ for sale in the United States in 2022[82] and have been, and are currently, selling, and supporting the use of, the 2022 Motorola Edge+ in the United States.[83]

63.    Defendants have infringed and are infringing the Asserted Patents by making, using, offering to sell, importing, and selling (directly or through intermediaries) at least the Accused Products in this Judicial District and elsewhere in the United States. Further, Defendants have indirectly infringed the Asserted Patents by, without ImberaTek's authorization, making, selling, and supporting the Accused Products knowing that the same will be imported into, sold, and used in the United States and cause direct infringement.

64.    As detailed below, each element of at least one claim of one of the Asserted Patents is literally present in each Accused Product. To the extent that any element is not literally present, each such element is present under the doctrine of equivalents because it performs substantially the same function in substantially the same way to achieve substantially the same result, and any differences between the Accused Product and claim element are insubstantial.

---

[80]    https://motorolanews.com/unlock-precision-and-performance-with-the-new-moto-g-stylus-and-moto-g-5g/.

[81] https://www.motorola.com/us/en/p/phones/moto-g/g-5g-gen-2/pmipmfv34mu?srsltid=AfmBOor8GaiBEqIUvQzofcqRbcmNLNlpC1n4LF3DZNcRUEvBGgt1RMGp&pn=PAXD0010US.

[82]    https://motorolanews.com/find-your-edge-and-unleash-game-changing-performance-with-motorola-edge/.

[83]    https://en-us.support.motorola.com/app/answers/detail/a_id/169796/~/specifications---motorola-edge-%2B-%282022%29.

D. **The Negotiations Between the Parties and Defendants' Knowledge of the Asserted Patents**

65.     On information and belief, Defendants have been aware of the Asserted Patents since at least January 27, 2021 when ImberaTek sent a letter to each of Motorola Mobility, LLC[84] and Lenovo Inc. (both of whom are part of Lenovo and the Group) (i) asserting that each was "likely utilizing and causing its customers and users to utilize," *inter alia*, the 324 Patent and "should explore taking a license from ImberaTek to cover both its past and future utilization of" those patents, (ii) including an "exemplary listing of our patents" on an Exhibit A that included the 194 Patent, 587 Patent, and 485 Patent, and (iii) stating that "ImberaTek expects that you may currently be using, or will in the future be using, additional patented inventions from this portfolio." *See* Exs. 14 and 15. ImberaTek further informed them that it "is willing to immediately negotiate a license under its patent portfolio" and "would like to explore an amicable business resolution . . . ." *See* Exs. 14 and 15. On information and belief, Defendants did not respond, so, on February 22, 2024, ImberaTek sent a follow up email to Taylor Ludlam (on information and belief, the "Executive Director, Global Litigation" for Lenovo, including all of the Defendants, at the time)[85] and Fergal Clarke (on information and belief, the "Director, Patent Licensing" for Lenovo, including all of the Defendants, at the time)[86] attaching the letters it sent on January 27, 2021. *See* Ex. 16.

66.     On information and belief, Defendants subsequently responded, and ImberaTek exchanged drafts of an NDA with Mr. Clarke, QunQun Dai of Lenovo, and Lenovo's outside

---

[84] The letter to Motorola Mobility, LLC was sent to Sergio Buniac, who, on information and belief, was and is the President of "Motorola Mobility (a Lenovo Company)" and a Senior Vice President of Lenovo and the Group, including all of the Defendants. *See* https://www.linkedin.com/in/sergio-buniac-388974123/?originalSubdomain=br.

[85] *See* https://www.linkedin.com/in/taylor-ludlam-9407556b/.

[86] *See* https://www.linkedin.com/in/fergal-clarke-851605/?originalSubdomain=ie.

counsel Jerald Gnuschke in June and July of 2024. *See* Ex. 17. On information and belief, on or around July 21, 2024, ImberaTek sent Mr. Clarke, Ms. Dai, and Mr. Gnuschke detailed, representative claim charts reading several ImberaTek patents, including the 485 and 324 Patents, on Defendants' Edge+ and Razr+ mobile phones. *See id.* ImberaTek explained the charts showed how Defendants' products infringed ImberaTek's patents and that ImberaTek was "OK with no NDA at this point of the negotiations." *See id.* Further, on October 22, 2024, ImberaTek sent Mr. Clark, Ms. Dai, and Mr. Gnuschke an email advising them to "Please take notice that Lenovo/Motorola also utilizes and causes its customers and users to utilize [the 194 Patent]. By way of non-limiting example, the processors in your Moto G Stylus 5G phone use this patent. This is a further example of why Lenovo/Motorola requires a license to ImberaTek's patent portfolio." *See id.* On information and belief, Defendants have not communicated further with ImberaTek.

67.    Thus, over the course of five years, ImberaTek was met with ignored communications, delay, and prolonged periods for responses, including a long delay by Defendants in negotiating a simple and unnecessary nondisclosure agreement. Defendants did not substantively respond to ImberaTek's communications or licensing offers or provide a good faith counteroffer. Defendants instead engaged in holdout behavior, refusing to engage in good faith negotiations, all while knowingly and willfully continuing to infringe.

68.    In light of the foregoing, Defendants, on information and belief, by no later than January 27, 2021, were provided actual notice of infringement of each Asserted Patent, knew of each of the Asserted Patents, and knew or should have known since that date that the manufacture, use, importation, offer for sale, and/or sale of the Accused Products infringed each of the Asserted Patents. Additionally, for the 485 and 324 Patents, Defendants, by no later than July 21, 2024, were provided actual notice of infringement of the 485 and 324 Patents, knew of the 485 and 324

Patents, and knew or should have known since that date that the manufacture, use, importation, offer for sale, and/or sale of the Accused Products infringed each of the 485 and 324 Patents. Additionally, for the 194 Patent, Defendants, by no later than October 22, 2024, were provided actual notice of infringement of the 194 Patent, knew of the 194 Patent, and knew or should have known since that date that the manufacture, use, importation, offer for sale, and/or sale of the Accused Products infringed the 194 Patent. Additionally, Defendants have knowledge of the 324, 587, and 194 Patents and their infringement thereof by the date on which this Complaint was filed.

> **E.     Claims for Patent Infringement**

69.     The allegations provided below are exemplary and without prejudice to ImberaTek's infringement contentions provided pursuant to the Court's scheduling order and local rules. In providing these allegations, ImberaTek does not provide or imply any particular claim construction or the precise scope of the claims. ImberaTek's claim construction contentions regarding the meaning and scope of the claim terms will be provided under the Court's scheduling order and local rules.

70.     The below infringement allegations are based on publicly available information and a reasonable investigation of the structure and operation of the Accused Products. ImberaTek reserves the right to modify this description, including, for example, on the basis of information that it obtains during discovery about the Accused Products and the Asserted Patents.

71.     To the extent any patentee's or licensee's product was sold in the United States that embodied an Asserted Patent and was not marked with that Patent, ImberaTek is, nevertheless, entitled to past damages for that Patent for any period in which any such unmarked products were not sold in the United States, and for the entire period after actual notice occurred as described *supra*.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 9,107,324

72.    ImberaTek repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

73.    Defendants, without ImberaTek's authority, have been making, using, offering to sell, selling, and importing, and continue to make, use, offer to sell, sell, and import, in the United States at least the Accused Products, certain of which directly infringe one or more claims of the 324 Patent, literally or under the doctrine of equivalents.

74.    The claims of the 324 Patent are valid and enforceable.

75.    On information and belief, at least the 2022 Edge+, 2023 Edge+, 2024 Edge, 2023 Razr, 2023 Razr+, 2024 Razr+, 2025 Razr Ultra, 2023 Moto G 5G, 2023 Moto G Stylus 5G, 2025 Moto G Stylus, 2024 Moto G Stylus 5G, 2022 Moto G Stylus 5G, 2021 Edge, 2021 Moto G Stylus 5G, 2020 Razr 5G, 2020 Edge, 2021 Edge 5G UW, and 2025 Razr+, and any other of Defendants' products made, sold, or used in the United States, or imported into the United States during the term of the 324 Patent having the same or similar infringing PMIC components (the PM6150L, PM6150C, PM6375, PM6450, PM7250, PM7250B, PM7350C, PM8350, PM8350B, PM8350C, PM8450, PM8550BH, PM6350, and 4C3 PMICs) as the forgoing specifically identified product models (the "324 Accused Products"), infringe at least one claim of the 324 Patent. For example, claim 17 recites:

> Circuit module, comprising
>
> a conductor layer comprising conductors, the conductors having a first surface and a second surface and at least two layers of metal between the first surface and the second surface;
>
> a first insulator layer having a first surface and a second surface, the second surface of the first insulator layer covering the first surface of the conductors;
>
> at least one second insulator layer on the first surface of the first insulator layer;

at least one component inside the at least one second insulator layer, the at least one component comprising contact terminals containing at least one layer of metal;

contact elements between at least some of the contact terminals and at least some of the conductors for forming electrical contacts, the contact elements comprising an intermediate layer on the surface of the contact terminal, the intermediate layer containing at least one layer of metal, a contact surface area ($A_{CONT\ 1}$) between the intermediate layer and the contact terminal being less than a surface area ($A_{PAD}$) of the contact terminal;

at least one layer of metal in the contact terminals containing a first metal;

at least one layer of metal in the conductors containing a second metal; and

the intermediate layer containing a third metal.

76.    The 324 Accused Products and Defendants' infringing activities violate one or more subsections of 35 U.S.C. § 271.

77.    On information and belief, Defendants have infringed and continue to infringe in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, one or more claims of the 324 Patent, including at least claim 17, by making, using, offering to sell, selling, and importing the 324 Accused Products without authority or license. The 324 Accused Products, and/or Defendants' manufacturing thereof, satisfy each and every limitation of one or more claims of the 324 Patent. In that regard, the exemplary claim charts attached as Exhibits 19-31 show how the 324 Accused Products include each element of claim 17 of the 324 Patent. Defendants have thereby directly infringed one or more claims of the 324 Patent.

78.    As shown in the charts, the 324 Accused Products include a "[c]ircuit module, comprising: a conductor layer comprising conductors, the conductors having a first surface and a second surface and at least two layers of metal between the first surface and the second surface." For example, cross sections of the PM6150C, PM6375, PM6450, PM7250, PM7250B, PM7350C, PM8350, PM8350B, PM8350C, PM8450, PM8550BH, PM6350, and 4C3 PMICs used in the 324

Accused Products show a circuit module with a conductor layer including conductors having a first surface and a second surface and at least two layers of metal, *i.e.*, copper and titanium, between the first surface and the second surface. *See* Exhibits 19-31.

79.    As also shown in the charts, the 324 Accused Products include "a first insulator layer having a first surface and a second surface, the second surface of the first insulator layer covering the first surface of the conductors." For example, cross sections of the PM6150C, PM6375, PM6450, PM7250, PM7250B, PM7350C, PM8350, PM8350B, PM8350C, PM8450, PM8550BH, PM6350, and 4C3 PMICs used in the 324 Accused Products show a first insulator layer having a first surface and a second surface, the second surface of the first insulator layer covering the first surface of the conductors. *See* Exhibits 19-31.

80.    As further shown in the charts, the 324 Accused Products include "at least one second insulator layer on the first surface of the first insulator layer." For example, cross sections of the PM6150C, PM6375, PM6450, PM7250, PM7250B, PM7350C, PM8350, PM8350B, PM8350C, PM8450, PM8550BH, PM6350, and 4C3 PMICs used in the 324 Accused Products show a circuit module with at least one second insulator layer on the first surface of the first insulator layer. *See* Exhibits 19-31.

81.    As further shown in the charts, the 324 Accused Products include "at least one component inside the at least one second insulator layer, the at least one component comprising contact terminals containing at least one layer of metal." For example, cross sections of the PM6150C, PM6375, PM6450, PM7250, PM7250B, PM7350C, PM8350, PM8350B, PM8350C, PM8450, PM8550BH, PM6350, and 4C3 PMICs used in the 324 Accused Products show at least one component inside the at least one second insulator layer, the at least one component including contact terminals containing at least one layer of metal, *i.e.*, aluminum. *See* Exhibits 19-31.

82.     As further shown in the charts, the 324 Accused Products include "contact elements between at least some of the contact terminals and at least some of the conductors for forming electrical contacts, the contact elements comprising an intermediate layer on the surface of the contact terminal, the intermediate layer containing at least one layer of metal, a contact surface area ($A_{CONT\ 1}$) between the intermediate layer and the contact terminal being less than a surface area ($A_{PAD}$) of the contact terminal." For example, cross sections of the PM6150C, PM6375, PM6450, PM7250, PM7250B, PM7350C, PM8350, PM8350B, PM8350C, PM8450, PM8550BH, PM6350, and 4C3 PMICs used in the 324 Accused Products show contact elements between at least some of the contact terminals and at least some of the conductors for forming electrical contacts, the contact elements including an intermediate layer on the surface of the contact terminal, the intermediate layer containing at least one layer of metal, *i.e.*, titanium, a contact surface area ($A_{CONT\ 1}$) between the intermediate layer and the contact terminal being less than a surface area ($A_{PAD}$) of the contact terminal. *See* Exhibits 19-31.

83.     As further shown in the charts, the 324 Accused Products include "at least one layer of metal in the contact terminals containing a first metal." For example, cross sections of the PM6150C, PM6375, PM6450, PM7250, PM7250B, PM7350C, PM8350, PM8350B, PM8350C, PM8450, PM8550BH, PM6350, and 4C3 PMICs from the 324 Accused Products show at least one layer of metal in the contact terminals containing a first metal, *i.e.*, aluminum. *See* Exhibits 19-31.

84.     As further shown in the charts, the 324 Accused Products include "at least one layer of metal in the conductors containing a second metal." For example, cross sections of the PM6150C, PM6375, PM6450, PM7250, PM7250B, PM7350C, PM8350, PM8350B, PM8350C, PM8450, PM8550BH, PM6350, and 4C3 PMICs from the 324 Accused Products show at least

one layer of metal in the conductors containing a second metal, *i.e.*, copper or titanium. *See* Exhibits 19-31.

85.     As further shown in the charts, the 324 Accused Products include "the intermediate layer containing a third metal." For example, cross sections of the PM6150C, PM6375, PM6450, PM7250, PM7250B, PM7350C, PM8350, PM8350B, PM8350C, PM8450, PM8550BH, PM6350, and 4C3 PMICs from the 324 Accused Products show the intermediate layer containing a third metal, *i.e.*, titanium. *See* Exhibits 19-31.

86.     By at least January 27, 2021, ImberaTek disclosed the existence of the 324 Patent to Defendants and informed Defendants that they were "likely utilizing and causing [their] customers and users to utilize" the 324 Patent and "should explore taking a license from ImberaTek to cover both [their] past and future utilization of" that patent. And on July 21, 2024, ImberaTek sent Defendants claim charts showing how Defendants infringed the 324 Patent. Further, on information and belief, Defendants monitor ImberaTek's patent portfolio. Thus, Defendants have had knowledge of the 324 Patent and that their activities infringe the 324 Patent since at least January 27, 2021 and no later than July 21, 2024. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least January 27, 2021 and no later than July 21, 2024 that their customers, distributors, and other purchasers of the 324 Accused Products are infringing the 324 Patent at least because Defendants have known that they are infringing the 324 Patent.

87.     In addition and in the alternative, by at least the date on which this Complaint was filed, ImberaTek disclosed the existence of the 324 Patent to Defendants and identified at least some of Defendants' activities that infringe the 324 Patent. Thus, Defendants have had knowledge of the 324 Patent and that their activities infringe the 324 Patent since at least the date on which

this Complaint was filed. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least the date on which this Complaint was filed that their customers, distributors, and other purchasers of the 324 Accused Products are infringing the 324 Patent at least because Defendants have known that they are infringing the 324 Patent.

88.     Defendants' acts of infringement of the 324 Patent have been committed and are being committed with full knowledge of ImberaTek's patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, Defendants could not reasonably or subjectively have believed that their actions do or did not constitute infringement of the 324 Patent, nor could they reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, Defendants continued their infringing activities. Defendants' directly and indirectly infringing acts constitute willful, intentional, and deliberate infringement, entitling ImberaTek to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

89.     On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, Defendants have actively, knowingly, and intentionally induced infringement of one or more claims of the 324 Patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell the 324 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, Defendants have actively promoted the sale, use, and importation of the 324 Accused Products in marketing materials, technical specifications, data sheets, web pages on their website (*e.g.,* https://www.motorola.com/us/en/homepage), press releases, and user manuals, as well as at trade shows and through their sales and distribution channels that encourage infringing sales, offers to sell, and importation of the 324 Accused Products or products containing infringing

chips in the 324 Accused Products. Defendants also manufactured the 324 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, Defendants have had knowledge of the 324 Patent and their infringement since at least January 27, 2021, and either knew that the induced acts constituted patent infringement or, alternatively, were willfully blind to the infringement.

90. On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, Defendants have contributorily infringed and continue to contributorily infringe one or more claims of the 324 Patent by offering to sell, selling, and/or importing into the United States material components of the 324 Accused Products that constitute a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the 324 Patent, and which are not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the 324 Accused Products include infringing processors, integrated circuits, and other semiconductor components that are a material part of at least the invention of claim 17 of the 324 Patent for the reasons set forth above.

91. The infringing semiconductor chips of the 324 Accused Products are not materially changed by subsequent processes and do not become trivial and nonessential components of another product.

92. ImberaTek has suffered and continues to suffer damages as a result of Defendants' infringement of the 324 Patent.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 8,487,194

93. ImberaTek repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

94.     Defendants, without ImberaTek's authority, have been making, using, offering to sell, selling, and importing, and continue to make, use, offer to sell, sell, and import, in the United States at least the Accused Products, certain of which directly infringe one or more claims of the 194 Patent, literally or under the doctrine of equivalents.

95.     The claims of the 194 Patent are valid and enforceable.

96.     At least the 2023 Razr, 2023 Edge+, 2023 Moto G Stylus 5G, 2024 Razr+, 2025 Razr Ultra, 2024 Edge, 2025 Moto G Stylus, 2024 Moto G Stylus 5G, 2021 Edge, 2021 Moto G Stylus 5G, 2022 Moto G Stylus, 2023 Moto G, 2020 Razr 5G, 2020 Edge, 2021 Edge 5G UW, and 2025 Razr+, and, on information and belief and the opportunity for further investigation and discovery, the 2022 Edge+ and 2023 Razr+, and any other of Defendants' products made, sold, or used in the United States, or imported into the United States during the term of the 194 Patent having the same or similar infringing PMIC components (the PM6150L, PM6375, PM7350C, PM8550BH, PM6150C, PM7250, PM7250B, PM6450, PM8350B, and 4C3 PMICs) as the forgoing specifically identified product models (the "194 Accused Products"), infringe at least one claim of the 194 Patent. For example, claim 1 recites:

A circuit board, comprising:

a conductor-pattern layer;

an insulating-material layer supporting the conductor-pattern layer;

at least one component inside the insulating-material layer, the component having a plurality of contact areas;

a set of contact elements between the conductor-pattern layer and contact areas for electrically connecting the conductor-pattern layer and the at least one component;

wherein the set of contact elements comprise a plurality of individual contact elements for at least one single contact area in said plurality of contact areas.

.

97.     The 194 Accused Products and Defendants' infringing activities violate one or more subsections of 35 U.S.C. § 271.

98.     On information and belief, Defendants have infringed and continue to infringe in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, one or more claims of the 194 Patent, including at least claim 1, by making, using, offering to sell, selling, and importing the 194 Accused Products without authority or license. The 194 Accused Products, and/or Defendants' manufacturing thereof, satisfy each and every limitation of one or more claims of the 194 Patent. In that regard, the exemplary claim charts attached as Exhibits 32-40 show how the 194 Accused Products include each element of claim 1 of the 194 Patent. Defendants have thereby directly infringed one or more claims of the 194 Patent.

99.     As shown in the charts, the 194 Accused Products include "[a] circuit board, comprising: a conductor-pattern layer." For example, cross sections of the PM6375, PM7350C, PM8550BH, PM6150C, PM7250, PM7250B, PM6450, PM8350B, and 4C3 PMICs used in the 194 Accused Products show a circuit board with a conductor-pattern layer. *See* Exhibits 32-40.

100.    As also shown in the charts, the 194 Accused Products include "an insulating-material layer supporting the conductor-pattern layer." For example, cross sections of the PM6375, PM7350C, PM8550BH, PM6150C, PM7250, PM7250B, PM6450, PM8350B, and 4C3 PMICs used in the 194 Accused Products show an insulating-material layer supporting the conductor-pattern layer. *See* Exhibits 32-40.

101.    As further shown in the charts, the 194 Accused Products include "at least one component inside the insulating-material layer, the component having a plurality of contact areas." For example, cross sections of the PM6375, PM7350C, PM8550BH, PM6150C, PM7250, PM7250B, PM6450, PM8350B, and 4C3 PMICs used in the 194 Accused Products show at least

one component inside the insulating-material layer, the component having a plurality of contact areas. *See* Exhibits 32-40.

102.    As further shown in the charts, the 194 Accused Products include "a set of contact elements between the conductor-pattern layer and contact areas for electrically connecting the conductor-pattern layer and the at least one component." For example, cross sections of the PM6375, PM7350C, PM8550BH, PM6150C, PM7250, PM7250B, PM6450, PM8350B, and 4C3 PMICs used in the 194 Accused Products show a set of contact elements between the conductor-pattern layer and contact areas for electrically connecting the conductor-pattern layer and the at least one component, as seen in an Energy Dispersive X-Ray ("EDX") copper layer image showing a copper conductor-pattern layer and copper contact elements. *See* Exhibits 32-40.

103.    As further shown in the charts, the 194 Accused Products include "wherein the set of contact elements comprise a plurality of individual contact elements for at least one single contact area in said plurality of contact areas." For example, cross sections of the PM6375, PM7350C, PM8550BH, PM6150C, PM7250, PM7250B, PM6450, PM8350B, and 4C3 PMICs used in the 194 Accused Products show that the set of contact elements include a plurality of individual contact elements for at least one single contact area in the plurality of contact areas. *See* Exhibits 32-40.

104.    By at least January 27, 2021, ImberaTek disclosed the existence of the 194 Patent to Defendants in an "exemplary listing of our patents" and stated that "ImberaTek expects that you may currently be using, or will in the future be using, additional patented inventions from this portfolio." And by at least October 22, 2024, ImberaTek advised Defendants that they "utilize[] and cause[ their] customers and users to utilize [the 194 Patent]. By way of non-limiting example, the processors in your Moto G Stylus 5G phone use this patent. This is a further example of why

Lenovo/Motorola requires a license to ImberaTek's patent portfolio." Further, on information and belief, Defendants monitor ImberaTek's patent portfolio. Thus, Defendants have had knowledge of the 194 Patent and that their activities infringe the 194 Patent since at least January 27, 2021 and no later than October 22, 2024. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least January 27, 2021 and no later than October 22, 2024 that their customers, distributors, and other purchasers of the 194 Accused Products are infringing the 194 Patent at least because Defendants have known that they are infringing the 194 Patent.

105.    In addition and in the alternative, by at least the date on which this Complaint was filed, ImberaTek disclosed the existence of the 194 Patent to Defendants and identified at least some of Defendants' activities that infringe the 194 Patent. Thus, Defendants have had knowledge of the 194 Patent and that their activities infringe the 194 Patent since at least the date on which this Complaint was filed. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least the date on which this Complaint was filed that their customers, distributors, and other purchasers of the 194 Accused Products are infringing the 194 Patent at least because Defendants have known that they are infringing the 194 Patent.

106.    Defendants' acts of infringement of the 194 Patent have been committed and are being committed with full knowledge of ImberaTek's patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, Defendants could not reasonably or subjectively have believed that their actions do or did not constitute infringement of the 194 Patent, nor could they reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, Defendants continued their infringing activities. Defendants' direct and indirect infringing acts constitute willful, intentional,

and deliberate infringement, entitling ImberaTek to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

107.    On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, Defendants have actively, knowingly, and intentionally induced infringement of one or more claims of the 194 Patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell the 194 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, Defendants have actively promoted the sale, use, and importation of their infringing 194 Accused Products in marketing materials, technical specifications, data sheets, web pages on their website (*e.g.*, https://www.motorola.com/us/en/homepage), press releases, and user manuals, as well as at trade shows and through their sales and distribution channels that encourage infringing sales, offers to sell, and importation of the 194 Accused Products or products containing infringing chips in the 194 Accused Products. Defendants also manufactured the 194 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, Defendants have had knowledge of the 194 Patent and their infringement since at least January 27, 2021, and either knew that the induced acts constituted patent infringement or, alternatively, were willfully blind to the infringement.

108.    On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, Defendants have contributorily infringed and continue to contributorily infringe one or more claims of the 194 Patent by offering to sell, selling, and/or importing into the United States material components of the 194 Accused Products that constitute a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the 194 Patent, and which are not a staple article or commodity of commerce

suitable for substantial non-infringing use. For example, the 194 Accused Products include infringing processors, integrated circuits, and other semiconductor components that are a material part of at least the invention of claim 1 of the 194 Patent for the reasons set forth above.

109.    The infringing semiconductor chips of the 194 Accused Products are not materially changed by subsequent processes and do not become trivial and nonessential components of another product.

110.    ImberaTek has suffered and continues to suffer damages as a result of Defendants' infringement of the 194 Patent.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 8,817,485

111.    ImberaTek repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

112.    During the term of the 485 Patent, the 485 Patent was valid and enforceable, and Defendants, without ImberaTek's authority, made, used, offered to sell, sold, and imported into the United States at least the Accused Products, certain of which directly infringe one or more claims of the 485 Patent, literally or under the doctrine of equivalents.

113.    At least the 2022 Edge+, 2023 Moto G 5G, 2023 Razr+, 2023 Razr, 2023 Edge+, 2020 Edge, 2020 Razr, 2021 Moto G Stylus 5G, 2021 Edge, 2022 Moto G Stylus 5G, 2023 Moto G Stylus, and 2021 Edge 5G UW, and any other of Defendants' products made, sold, or used in the United States, or imported into the United States during the term of the 485 Patent having the same or similar infringing PMIC components (the PM6150L, PM6150C, PM6350, PM6450, PM7250, PM7250B, PM8350, PM8350C, PM8450, PM6375, PM7350C, and PM8550BH PMICs) as the forgoing specifically identified product models (the "485 Accused Products"), infringe at least one claim of the 485 Patent. For example, claim 20 recites:

A single-layer component package, comprising:

a single conductive-pattern layer comprising a first conductive material extending throughout the single conductive-pattern layer;

a semiconductor chip having contact pads facing the single conductive-pattern layer;

an insulating-material layer supporting the single conductive-pattern layer and surrounding the semiconductor chip; and solid contact bumps solderlessly, metallurgically and electrically connecting the contact pads to the single conductive-pattern layer, at least part of each solid contact bump being made of copper, and

wherein the single conductive-pattern layer is the only conductive-pattern layer within the single-layer component package.

114.    The 485 Accused Products and Defendants' infringing activities violate one or more subsections of 35 U.S.C. § 271.

115.    On information and belief, Defendants infringed, in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, one or more claims of the 485 Patent, including at least claim 20, by making, using, offering to sell, selling, and importing the 485 Accused Products without authority or license. The 485 Accused Products, and/or Defendants' manufacturing thereof, satisfy each and every limitation of one or more claims of the 485 Patent. In that regard, the exemplary claim charts attached as Exhibits 41-51 show how the 485 Accused Products include each element of claim 20 of the 485 Patent. Defendants have thereby directly infringed one or more claims of the 485 Patent.

116.    As shown in the charts, the 485 Accused Products include "[a] single-layer component package, comprising: a single conductive-pattern layer comprising a first conductive material extending throughout the single conductive-pattern." For example, cross sections of the PM6150C, PM6350, PM6450, PM7250, PM7250B, PM8350, PM8350C, PM8450, PM6375, PM7350C, and PM8550BH PMICs used in the 485 Accused Products show a single conductive-

pattern layer including a first conductive material extending throughout the single conductive-pattern, where a copper EDX map shows the first conductive material is copper. *See* Exhibits 41-51.

117.    As also shown in the charts, the 485 Accused Products include "a semiconductor chip having contact pads facing the single conductive-pattern layer." For example, cross sections of the PM6150C, PM6350, PM6450, PM7250, PM7250B, PM8350, PM8350C, PM8450, PM6375, PM7350C, and PM8550BH PMICs used in the 485 Accused Products show a semiconductor chip having contact pads facing the single conductive-pattern layer. *See* Exhibits 41-51.

118.    As further shown in the charts, the 485 Accused Products include "an insulating-material layer supporting the single conductive-pattern layer and surrounding the semiconductor chip." For example, cross sections of the PM6150C, PM6350, PM6450, PM7250, PM7250B, PM8350, PM8350C, PM8450, PM6375, PM7350C, and PM8550BH PMICs used in the 485 Accused Products show an insulating-material layer supporting the single conductive-pattern layer and surrounding the semiconductor chip as seen in an EDX map illustrating the insulating-material layer including insulating materials such as oxygen and silicon. *See* Exhibits 41-51.

119.    As further shown in the charts, the 485 Accused Products include "solid contact bumps solderlessly, metallurgically and electrically connecting the contact pads to the single conductive-pattern layer, at least part of each solid contact bump being made of copper." For example, cross sections of the PM6150C, PM6350, PM6450, PM7250, PM7250B, PM8350, PM8350C, PM8450, PM6375, PM7350C, and PM8550BH PMICs used in the 485 Accused Products show solid contact bumps solderlessly, metallurgically, and electrically connecting the

contact pads to the single conductive-pattern layer and, as seen in an EDX map, at least part of each solid contact bump is made of copper. *See* Exhibits 41-51.

120.    As further shown in the charts, the 485 Accused Products include "wherein the single conductive-pattern layer is the only conductive-pattern layer within the single-layer component package." For example, cross sections of the PM6150C, PM6350, PM6450, PM7250, PM7250B, PM8350, PM8350C, PM8450, PM6375, PM7350C, and PM8550BH PMICs used in the 485 Accused Products show that the single conductive-pattern layer is the only conductive-pattern layer within the single-layer component package. *See* Exhibits 41-51.

121.    By at least January 27, 2021, ImberaTek disclosed the existence of the 485 Patent to Defendants in an "exemplary listing of our patents" and stated that "ImberaTek expects that you may currently be using, or will in the future be using, additional patented inventions from this portfolio." Further, the 485 Patent is a continuation-in-part of the 527 Patent, and, on January 27, 2021, ImberaTek disclosed the existence of the 527 Patent to Defendants and informed Defendants that they were "likely utilizing and causing [their] customers and users to utilize" the 527 Patent and "should explore taking a license from ImberaTek to cover both [their] past and future utilization of" that patent. *See* Exhibits 14, 15. And on July 21, 2024, ImberaTek sent Defendants claim charts showing how Defendants infringed the 485 Patent. Further, on information and belief, Defendants monitor ImberaTek's patent portfolio. Thus, on information and belief, Defendants have had knowledge of the 485 Patent and that their activities infringe the 485 Patent since at least January 27, 2021 and no later than July 21, 2024. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least January 27, 2021 and no later than July 21, 2024 that their customers, distributors, and other purchasers of the 485 Accused Products infringed the 485 Patent at least because Defendants had knowledge of their infringement of the 485 Patent.

122.    Defendants' acts of infringement of the 485 Patent have been committed with full knowledge of ImberaTek's patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, Defendants could not reasonably or subjectively have believed that their actions do or did not constitute infringement of the 485 Patent, nor could they reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, Defendants continued their infringing activities. Defendants' directly and indirectly infringing acts constitute willful, intentional, and deliberate infringement, entitling ImberaTek to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

123.    On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, Defendants have actively, knowingly, and intentionally induced infringement of one or more claims of the 485 Patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell the 485 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, Defendants have actively promoted the sale, use, and importation of the 485 Accused Products in marketing materials, technical specifications, data sheets, web pages on their website (*e.g.*, https://www.motorola.com/us/en/homepage), press releases, and user manuals, as well as at trade shows and through their sales and distribution channels that encourage infringing sales, offers to sell, and importation of the 485 Accused Products or products containing infringing chips in the 485 Accused Products. Defendants also manufactured the 485 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, Defendants have had knowledge of the 485 Patent and their infringement since at least

January 27, 2021, and either knew that the induced acts constituted patent infringement or, alternatively, were willfully blind to the infringement.

124.    On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, Defendants have contributorily infringed one or more claims of the 485 Patent by offering to sell, selling, and/or importing into the United States material components of the 485 Accused Products that constitute a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the 485 Patent, and which are not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the 485 Accused Products include infringing processors, integrated circuits, and other semiconductor components that are a material part of at least the invention of claim 20 of the 485 Patent for the reasons set forth above.

125.    The infringing semiconductor chips of the 485 Accused Products are not materially changed by subsequent processes and do not become trivial and nonessential components of another product.

126.    ImberaTek has suffered and continues to suffer damages as a result of Defendants' infringement of the 485 Patent.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 9,883,587

127.    ImberaTek repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

128.    Defendants, without ImberaTek's authority, have been making, using, offering to sell, selling, and importing, and continue to make, use, offer to sell, sell, and import, in the United States at least the Accused Products, certain of which directly infringe one or more claims of the 587 Patent, literally or under the doctrine of equivalents.

129.    The claims of the 587 Patent are valid and enforceable.

130.    At least the 2020 Edge, 2020 Razr 5G, 2021 Moto G Stylus 5G, 2021 Edge, 2021 Edge 5G UW, 2022 Edge+, 2023 Edge+, 2023 Razr, 2023 Razr+, 2024 Razr+, 2025 Razr Ultra, 2023 Moto G 5G, 2025 Moto G Stylus, 2022 Moto G Stylus 5G, 2024 Edge, 2023 Moto G Stylus 5G, 2024 Moto G Stylus 5G, and 2025 Razr+, and any other of Defendants' products made, sold, or used in the United States, or imported into the United States during the term of the 587 Patent having the same or similar infringing PMIC components (the PM6150L, PM6350, PM6450, PM7250, PM7250B, PM8350, PM8350B, PM8350C, PM8550BH, PM7350C, PM8450, 4C3, PM6375, and PM6150C PMICs) as the forgoing specifically identified product models (the "587 Accused Products"), infringe at least one claim of the 587 Patent. For example, claim 1 recites:

A circuit module, comprising

an insulator layer;

at least one component inside the insulator layer, the at least one component comprising contact terminals with contact surfaces of alumin[]um;

contact elements on the surface of the contact terminals, the contact elements comprising an intermediate layer of at least one metal other than alumin[]um directly on the contact surfaces of the component and at least one layer of copper on a surface of the intermediate layer; and

conductor pattern on a surface of the insulator layer and in contact with the contact elements, conductors of the conductor pattern comprising an intermediate layer of the same at least one metal than the intermediate layer of the contact elements and at least one layer of copper on a first surface of the intermediate layer.

131.    The 587 Accused Products and Defendants' infringing activities violate one or more subsections of 35 U.S.C. § 271.

132.    On information and belief, Defendants have infringed and continue to infringe in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, one or more claims of the 587 Patent, including at least claim 1, by making, using, offering to sell, selling, and

importing the 587 Accused Products without authority or license. The 587 Accused Products, and/or Defendants' manufacturing thereof, satisfy each and every limitation of one or more claims of the 587 Patent. In that regard, the exemplary claim charts attached as Exhibits 52-64 show how the 587 Accused Products include each element of claim 1 of the 587 Patent. Defendants have thereby directly infringed one or more claims of the 587 Patent.

133.    As shown in the charts, the 587 Accused Products include "[a] circuit module, comprising an insulator layer." For example, cross sections of the PM6350, PM6450, PM7250, PM7250B, PM8350, PM8350B, PM8350C, PM8550BH, PM7350C, PM8450, 4C3, PM6375, and PM6150C PMICs used in the 587 Accused Products show a circuit module with an insulating layer as seen in an EDX map illustrating the insulator layer including insulating materials such as oxygen and silicon. *See* Exhibits 52-64.

134.    As also shown in the charts, the 587 Accused Products include "at least one component inside the insulator layer, the at least one component comprising contact terminals with contact surfaces of alumin[]um." For example, cross sections of the PM6350, PM6450, PM7250, PM7250B, PM8350, PM8350B, PM8350C, PM8550BH, PM7350C, PM8450, 4C3, PM6375, and PM6150C PMICs used in the 587 Accused Products show a component inside the insulator layer that includes contact terminals with contact surfaces of aluminum. *See* Exhibits 52-64.

135.    As further shown in the charts, the 587 Accused Products include "contact elements on the surface of the contact terminals, the contact elements comprising an intermediate layer of at least one metal other than alumin[]um directly on the contact surfaces of the component and at least one layer of copper on a surface of the intermediate layer." For example, cross sections of the PM6350, PM6450, PM7250, PM7250B, PM8350, PM8350B, PM8350C, PM8550BH, PM7350C, PM8450, 4C3, PM6375, and PM6150C PMICs used in the 587 Accused Products show

contact elements on the surface of the contact terminals, with the contact elements including an intermediate layer of a metal other than aluminum, *i.e.*, titanium, directly on the contact surfaces of the component and at least one layer of copper on a surface of the intermediate layer. *See* Exhibits 52-64.

136.    As further shown in the charts, the 587 Accused Products include "conductor pattern on a surface of the insulator layer and in contact with the contact elements, conductors of the conductor pattern comprising an intermediate layer of the same at least one metal than the intermediate layer of the contact elements and at least one layer of copper on a first surface of the intermediate layer." For example, cross sections of the PM6350, PM6450, PM7250, PM7250B, PM8350, PM8350B, PM8350C, PM8550BH, PM7350C, PM8450, 4C3, PM6375, and PM6150C PMICs used in the 587 Accused Products show a conductor pattern on a surface of the insulator layer and in contact with the contact elements, with conductors of the conductor pattern including an intermediate layer of the same at least one metal as the intermediate layer of the contact elements, *i.e.*, titanium, and at least one layer of copper on a first surface of the intermediate layer. *See* Exhibits 52-64.

137.    By at least January 27, 2021, ImberaTek disclosed the existence of the 587 Patent to Defendant in an "exemplary listing of our patents" and stated that "ImberaTek expects that you may currently be using, or will in the future be using, additional patented inventions from this portfolio." Also, the 587 Patent is a continuation of the 324 Patent, and, on January 27, 2021, ImberaTek disclosed the existence of the 324 Patent to Defendants and informed Defendants that they were "likely utilizing and causing [their] customers and users to utilize" the 324 Patent and "should explore taking a license from ImberaTek to cover both [their] past and future utilization of" that patent. Also, on or around July 21, 2024, ImberaTek sent Defendants a claim chart reading

the 324 Patent on Defendants' products. Further, on information and belief, Defendants monitor ImberaTek's patent portfolio. Thus, on information and belief, Defendants have had knowledge of the 587 Patent and that their activities infringe the 587 Patent since at least January 27, 2021 and no later than July 21, 2024. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least January 27, 2021 and no later than July 21, 2024 that their customers, distributors, and other purchasers of the 587 Accused Products infringed the 587 Patent at least because Defendants had knowledge of their infringement of the 587 Patent.

138.    In addition and in the alternative, by at least the date on which this Complaint was filed, ImberaTek disclosed the existence of the 587 Patent to Defendants and identified at least some of Defendants' activities that infringe the 587 Patent. Thus, Defendants have had knowledge of the 587 Patent and that their activities infringe the 587 Patent since at least the date on which this Complaint was filed. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least the date on which this Complaint was filed that their customers, distributors, and other purchasers of the 587 Accused Products are infringing the 587 Patent at least because Defendants have known that they are infringing the 587 Patent.

139.    Defendants' acts of infringement of the 587 Patent have been committed and are being committed with full knowledge of ImberaTek's patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, Defendants could not reasonably or subjectively have believed that their actions do or did not constitute infringement of the 587 Patent, nor could they reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, Defendants continued their infringing activities. Defendants' directly and indirectly infringing acts constitute willful,

intentional, and deliberate infringement, entitling ImberaTek to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

140.    On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, Defendants have actively, knowingly, and intentionally induced infringement of one or more claims of the 587 Patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell the 587 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, Defendants have actively promoted the sale, use, and importation of the 587 Accused Products in marketing materials, technical specifications, data sheets, web pages on their website (*e.g.*, https://www.motorola.com/us/en/homepage), press releases, and user manuals, as well as at trade shows and through their sales and distribution channels that encourage infringing sales, offers to sell, and importation of the 587 Accused Products or products containing infringing chips in the 587 Accused Products. Defendants also manufactured the 587 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, Defendants have had knowledge of the 587 Patent and their infringement since at least January 27, 2021, and either knew that the induced acts constituted patent infringement or, alternatively, were willfully blind to the infringement.

141.    On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, Defendants have contributorily infringed and continue to contributorily infringe one or more claims of the 587 Patent by offering to sell, selling, and/or importing into the United States material components of the 587 Accused Products that constitute a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the 587 Patent, and which are not a staple article or commodity of commerce

suitable for substantial non-infringing use. For example, the 587 Accused Products include infringing processors, integrated circuits, and other semiconductor components that are a material part of at least the invention of claim 1 of the 587 Patent for the reasons set forth above.

142.    The infringing semiconductor chips of the 587 Accused Products are not materially changed by subsequent processes and do not become trivial and nonessential components of another product.

143.    ImberaTek has suffered and continues to suffer damages as a result of Defendants' infringement of the 587 Patent.

## **PRAYER FOR RELIEF**

WHEREFORE, ImberaTek respectfully requests the following relief:

(A) The entry of judgment in favor of ImberaTek, and against Defendants, that Defendants have infringed and continue to infringe one or more claims of the Asserted Patents;

(B) The entry of judgment in favor of ImberaTek, and against Defendants, that Defendants have willfully infringed one or more claims of the Asserted Patents;

(C) The entry of a judgment awarding ImberaTek all damages resulting from Defendants' infringement, including no less than a reasonable royalty, and that such amount be trebled based on Defendants' willful, intentional, and deliberate infringement pursuant to 35 U.S.C. § 284, including pre-judgment and post-judgment interest and without limitation under 35 U.S.C. § 287;

(D) The entry of a judgment awarding ImberaTek its attorneys' fees pursuant to 35 U.S.C. § 285;

(E) The entry of judgment in favor of ImberaTek, and against Defendants, that interest, costs, and expenses be awarded in favor of ImberaTek;

(F) An accounting and/or supplemental damages for all damages occurring after any discovery cutoff;

(G) A grant of preliminary and permanent injunctions enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, from infringing, contributing to the infringement of, or inducing the infringement of the Asserted Patents that have not expired; and

(H) That this Court order such other relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, ImberaTek respectfully demands a trial by jury in this Action on all issues so triable.

Dated: February 23, 2026

Respectfully submitted,

/s/ Geoff Culbertson
Peter J. McAndrews (Lead Counsel)
pmcandrews@mcandrews-ip.com
Matthew G. McAndrews
mmcandrews@mcandrews-ip.com
McANDREWS, HELD & MALLOY, LTD.
500 West Madison St., 34th Floor
Chicago, IL 60661
Telephone: (312) 775-8000
Facsimile: (312) 775-8100

Geoff Culbertson
Texas Bar No. 24045732
gpc@texarkanalaw.com

Kelly Tidwell
Texas Bar No. 20020580
kbt@texarkanalaw.com
PATTON, TIDWELL & CULBERTSON, LLP
2800 Texas Boulevard (75503)
Post Office Box 5398
Texarkana, TX 75505-5398
Telephone: (903) 792-7080
Facsimile: (903) 792-8233

*Attorneys for Plaintiff,*
ImberaTek, LLC